## BEFORE THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA
## WESTERN DIVISION

HOLLI  LUNDAHL                                :

      Plaintiffs                            :

        v.

JULIE GROSS in her Official            :
and Personal Capacities as Director
for the State of South Dakota Office   :
of Rural Development; State of South
Dakota Office Of Rural Development;     :
Craig Steinley;  and Lance Lockwood    :
in  his Official and  Personal capacities
as a loan specialist for the state of South :
Dakota office of Rural Development

      Defendants                           :

_____

**CIVIL NO.**  $18-SD\ 90$

**PLAINTIFF'S  VERIFIED
COMPLAINT**

**DEMAND FOR A JURY TRIAL**

COMES NOW Plaintiff Holli Lundahl to allege as follows:

### SUBJECT MATTER JURISDICTION

1.   This court  has subject matter jurisdiction over the within claims under (1)  the Equal Credit Opportunity Act,  15 U.S.C. § 1691e permitting civil liability;   (2)  section 504 of the Rehabilitation Act of 1973;  (3)  section 1983,  the equal protection act under the class of one theory pursuant to Village of Willowbrook v. Olech, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000);  (4)  Ex Parte Young;  and  (5)  The Federal Housing Act, 42 U.S.C. § 3601, et seq. for accommodation, retaliation  and hostile housing  violations.

### PERSONAL JURSIDICTION

2.   This court has personal jurisdiction over both Plaintiff as a resident of the State of South Dakota and over all defendants as personal residents or agencies of the state of South Dakota.

## VENUE JURISDICTION

3.    Venue is proper in this court because the real property asset is located in the state of South Dakota.

## GENERAL ALLEGATIONS

4.    Plaintiff Holli Lundahl and co-applicant Marti Lundahl are judicially declared as permanently physically disabled persons under the Social Security Act.  HOLLI and Marti are protected persons under  the   Equal Credit Opportunity Act,  15 U.S.C. § 1691e;  section 504 of the Rehabilitation Act of 1973;  the equal protection act under the class of one theory, and  the Federal Housing Act, 42 U.S.C. § 3601 et seq.

5.    Plaintiff and  her sister  Marti  desired  to participate in the single family direct home loan program offered by the USDA.   In 2017,  an initial application was submitted to a local USDA rural development office for this purpose.  The application was rejected because of medical debts falsely reported against Marti's credit  report.  Plaintiff and Marti were told to reapply after the debts were cleared up.

6.    Plaintiff and Marti discovered that  Marti's false credit reportings  were made by medicaid covered providers so they petitioned the medicaid board having jurisdiction over the respective providers to take action against the providers for medicaid fraud and attempted double dipping.   The derogatory reportings  were removed before Plaintiff and Marti would eventually make a second application.

7.    On  September 5, 2018,  Plaintiff  HOLLI  located  a stick built home in Rapid City, SD that both she and her sister desired to purchase,  for many reasons not the least of which included the close proximity to medical facilities in Rapid city  for day to day needed rehabilitation care of Marti.   HOLLI  entered into a purchase contract with the owner.   Their earnest deposit on the contract was the agreement to fund and replace the roof on the home which had been previously significantly damaged by Hail.  HOLLI got a commitment from a relative to fund  replacement of  the roof at a cost of $8,000  and which repairs would be made as soon as Plaintiff and  Marti received a confirmation for  a loan.

8.    By this time,  the derogatory credit had been removed from Marti's credit report and Holli (who had always had a credit score of 752)  joined with Marti's now improved credit score of 702,   allowed them to petition lenders  with a joint credit score of 702 (on a joint

application it is the lowest credit score that carries the day.).

9.    During the month of September of 2018, both HOLLI and Marti as joint applicants,  petitioned no less than 7 banks in South Dakota  to  obtain a loan for the purchase contract in the amount of $180,000.    HOLLI had already sourced into all possible home purchase assistance grants available both for disabled low income and  veteran households.    HOLLI obtained grant  sources from Grow South Dakota,  HomeStart Plus, PenFed and Heroes Welcome Home.  The total of these grants was  $31,000.   All grants were time limited.  With these grants,  HOLLI and Marti only needed an additional $149,000 to pay for the home  purchase.

10.    HOLLI and MARTI's combined disability income including annual cancer grants and welfare stipends  totaled  $2345.60 per month.  All  7  Banks  in South Dakota rejected HOLLI and MARTI for a loan because their  **loan to Income ratio was too high at the then present interest rates of 3.75%.**

11.    Because Plaintiffs could not get credit elsewhere,  they were perfect candidates for the USDA's section 502 Direct Loan program that had attendant thereto a subsidy program   that paid the mortgage interest down to 1% with a recapture of the contracted interest rate upon the sale of the home  or the   death of the applicant. See breakdown of  HOLLI and  Marti's repayment income on exhibit "1" attached at pg. 3.

12.    The USDA's  section  502 program determines their loan amounts based on the  applicants repayment ability with a loan carrying a  1%  subsidized  interest  rate. The repayment calculation method  is set forth  in **7 CFR 3550.53 - Eligibility requirements** and provides:

> (g)    **Repayment ability.**    Repayment ability means applicants must demonstrate adequate and dependably available income. The determination of income dependability will include consideration of the applicant's past history of annual income.
>> (1)  A very low-income applicant is considered to have repayment ability when the monthly amount required for payment of  principal, interest, taxes, and insurance **(PITI) does not exceed 29 percent of the applicant's repayment income**, **and the monthly amount required to pay PITI plus recurring monthly debts does not exceed 41 percent** of the applicant's repayment income.

Attached hereto as exhibit "1" (AND TO BE RECORDED UNDER SEAL) is Plaintiff's  submitted loan application to the USDA.    On page 3 of that application is the total

monthly income for Plaintiff and Marti totaling $2345.60 per month. Plaintiff's total monthly income and repayment income were the same amount as determined by regulations for the direct loan program and as memorialized in exhibit "4" attached which highlights the countable income for Plaintiff's household.    Times $2345.60 by 29% as shown below means that Plaintiffs' **subsidized** mortgage payment with principle, interest, taxes and insurance could not exceed $680.22 per month.

$$\$2345.60 \ \text{x} \ 29\% = \$680.22 \ \text{maximum PITI/mo}$$

Attached hereto as exhibit "2" is Plaintiff's and Marti's joint credit report showing **the only ongoing debts owed by them.  The HELOC loan reported on the credit report is for** the 5th wheel trailer shown at exhibit "3" attached and presently located at 885 US HWY 385, Oelrichs, SD.    Adding the PITI supra to Plaintiff's recurring monthly debt of $187 plus $25 is $892.22.    Taking Plaintiff and Marti's monthly repayment income of $2345.60 and timing that by 41% is $961.69. .

$$\$2345.60 \ \text{x} \ 41\% = \$961.65 \ \text{repayment ability after added debts}$$

Hence to meet the statutory **REPAYMENT ABILITY REQUIREMENT,** Plaintiffs PITI payment cannot exceed $680.22/mo  and cannot be more than $961.65/mo when applying Plaintiffs total debt profile.

13.    The property taxes on this property are $216.66/mo.  Plaintiff's house insurance is $69 per month. This means that Plaintiff's subsidized mortgage payment cannot exceed $365.21/mo  to get a total  PITI  less than the lowest figure  provided supra of $680.22.    Calculating a **loan amount at  $138,500** with an interest rate of 1%, subsidized as shown in exhibit "5" attached, tenders a PI amount of  $365.21/mo.  Adding the PI amount at  $365.21,  the insurance amount of $69 and the property tax amount at $216.66.  **tenders a  total PITI amount of  $650.87**  (see exhibit "6" attached) **. . . sufficiently below  the maximum entitlement of  $680.22..**

14.    Accordingly,  the maximum  loan  amount that was supposed to be available to Plaintiff and her sister by law  was  **$138,500.**  On October 3, 2018, Plaintiff  submitted the application for a direct loan  to Defendant LANCE plus her grant documents for all five

aforementioned grant sources. When obtaining housing assistance grants, the non-profit organizations will only verify their granting information and commitments through the loan officer ; here that was LANCE at the USDA.

15. Defendant LANCE refused to accept Plaintiff's additional cancer and non-profit grants obtained annually into the repayment ability figure as required under 7 CFR 3550.54 and identified in exhibit "4". Instead, after he calculated everything solely off Plaintiff's joint monthly SSI income, Plaintiff's LIEAP award and Plaintiff's food stamp award, Lance came up with **the** loan eligibility figure of **$126,500.** See exhibit "7" attached for this certificate of eligibility. This was the first act of discrimination in the credit granting process under the EOCA.

16. As soon as the certificate of eligibility was distributed to Plaintiff and the sellers, Plaintiff contacted the relative to fund replacement of the roof on the home at an expense of $8,000. HOLLI thereafter paid for a professional inspection report on the home and which report was tendered to LANCE on October 30, 2018. Upon Lance's review, only 2 unprotected minor holes on the outside planking were requested to be filled with silicone and painted. This was done within 24 hours.

17. Lance reported that he immediately ordered an appraisal on the property in October of 2018 – but allegedly did not have the name of the appraiser. In the interim, Lance was supposed to be processing all of Plaintiff's grants submitted to Lance on October 3, 2018 in the amount of $31,000.

18. One of the housing assistance grants expired on November 21, 2018. Anxious about the timely funding of this grant, HOLLI called Defendants Lance, Julie, other housing officers in South Dakota and in Washington DC seeking to obtain the name of the appraiser appointed by the USDA to appraise the home – in order to obtain a commitment date before November 21, 2018 for producing the appraisal report so that her time-lined grant did not expire.

19. Janell Telin, the single family housing director for South Dakota, on November 14, 2018 finally gave HOLLI the name of the appraiser Defendant Steinley. HOLLI called Steinley repeatedly on November 15 and 16, 2017 to secure a commitment date for doing the appraisal and submitting his report. STEINLEY finally returned HOLLI's calls on the morning of November 19, 2018 and reported that he would have the appraisal report submitted to LANCE by the morning of November 21, 2018. HOLLI reported this information back to

LANCE on the morning of November 19, 2018.   LANCE at  that point should have tried to lock the grant from Grow South Dakota. . . as the loan officer.   LANCE  DID  NOT ultimately contributing to the loss of this grant by the expiration date of November 21, 2018.

20.    Although  HOLLI  called  STEINLEY  several   times  to  confirm   timely performance,  STEINLEY  never returned HOLLI's calls thereafter and  never   produced  an appraisal report by November 21, 2018.

21.    When  the  grant  was  lost due to the intentional conduct of both STEINLEY and LANCE,  a  heightened  argument took place between LANCE and HOLLI  about  the loss of the grant.    LANCE offered no compensation to HOLLI for the lost grant.   Instead LANCE told HOLLI she was going to have to find some other way to fund the lost grant. HOLLI had to go to  private third parties to fund the difference in order not to lose the sale and her investments to date.

22.    When STEINLY failed to produce any appraisal report for more than 7 days after he promised to perform,  HOLLI  sued STEINLEY for  specific performance  in a state smaller claims court to secure effectiveness of her other time limited grants.   HOLLI advised LANCE of the suit and another argument ensued when LANCE   informed HOLLI that she could not sue an appraiser on independent  contract with the USDA and  HOLLI threw "the third party beneficiary rule" into LANCE's face.   HOLLI  subsequently asked LANCE for referral to  another independent appraiser and LANCE referred HOLLI to the state director's office,  defendant GROSS and  Janell Telin.   HOLLI was later advised by another state official "Shannon" that  Washington DC contracted the appraisers used by the state offices and  that  Shannon thought that  STEINLEY might be the only appraiser on contract with the USDA for the west side of the state.  Shannon told HOLLI to contact Washington DC to see if she could find another appraiser.  HOLLI did so and was merely peddled  back to Shannon without  any resolve.

23.    Immediately  after STEINLEY was served by the sheriff's office with the state performance lawsuit,   STEINLEY  finally  produced  a  copy  of  his  appraisal  report  around November 30, 2018 to Shannon who then dispatched it to LANCE  (and more than 1 1/2 months after the escrow had been funded with exception of the grants).

24.    In retaliation  to HOLLI having sued the appraiser for the performance of his duties in a state smaller claims court to obtain a swift judgment, **LANCE in conspiracy with GROSS,  unilaterally dropped the funding amount from the $126,500  certified in exhibit**

6.

**"7" attached – to $107,904.00 as shown in exhibit "8" attached; thus extorting HOLLI of the need to come up with an additional $18,000 to fund the escrow before LANCE would perform his final closing duties.  This second unilateral drop in the lending amount on the midnight hour of closing was a second act of discrimination against HOLLI under the ECOA  (2) because all or part of HOLLI's income derived from public assistance programs.**

25.    HOLLI  complained to LANCE that he was intentionally refusing to count all of HOLLI's disabled household's  repayment income wholly derived from public assistance programs as required under the regulations set forth in part at exhibit "4" attached and that the intentional failure to timely process HOLLI and Marti's disability housing assistance grants thereby  making the housing purchase opportunity fairly available to HOLLI's household also violated the FHA.   LANCE claimed that the reason he dropped HOLLI's loan amount down more than $18,000 was because the property taxes came in more than $16 a month than Lance had originally calculated at the loan value of $126,500.   HOLLI rebutted LANCE's excuse as false pretext for  intentional discrimination  against HOLLI as a disabled household because an additional monthly payment of $13  would not drop HOLLI's loan amount on a 38 year amortized loan more than $18,000.   HOLLI  complained that  LANCE's actions were retaliatory  because HOLLI sued the appraiser to do his job.

26.    At the midnight hour,  **LANCE reported to HOLLI that he would not close the escrow and secure the remaining two grants  until HOLLI necessarily obtained  the $18,000 +  additional extorted funds.**      By December 3, 2018,  HOLLI did obtain the additional extorted funds from third persons and demanded that Lance issue wiring instructions to the USDA to provide the loan proceeds to close escrow and that Lance issue a closing disclosure statement to PenFed foundation to fund the last grant.   .   LANCE intentionally made himself unavailable over the next five days  so as to time lapse HOLLI's other housing assistance grants.   HOLLI emailed LANCE her complaint about  the USDA's consistent extortion efforts to obstruct the sale.

27.    That Wednesday on  December 5, 2018,  the South Dakota  USDA head offices in Huron SD where  Defendant GROSS was based and the West side offices where LANCE managed the  USDA functions,  were shut down for the day for what was later discovered to be a statewide meeting on how the state of South Dakota  Housing office could further obstruct  HOLLI and MARTI's  sales transaction;  fully performed  upon by HOLLI and

MARTI and funded in escrow even down to the last extorted funding amount noticed by Lance on November 30,2018, to wit: 107,900;    and nearly $30,000 less than HOLLI's household qualified for.

      28.    On Thursday, December 6, 2018, LANCE contacted the Seller by phone to see if he would be willing to withdraw the sale. The Seller indicated NO. LANCE then reportedly told the seller about the meeting with state principals of the South Dakota USDA housing offices regarding HOLLI's repeated complaints to their offices and Washington DC about failing to close the transaction in a timely manner and causing additional damages. LANCE reported to the Seller that the state Director GROSS was managing the transaction, that GROSS would be distributing a letter to HOLLI and MARTI requiring them to produce additional documentation to close the transaction and if HOLLI and MARTI complied, the transaction would by closed by GROSS. The Seller called HOLLI upset about the failure in not having the transaction yet closed and indicating that he was going to back out of the sale because he was paying two mortgages and needed to get out of the mortgage attaching to the property.

      29.    On December 7, 2018, a Friday, the state Director GROSS emailed HOLLI the letter referred to by LANCE. Attached hereto as exhibit "9" is a re-dacted part of this letter. The letter mocked a pre-filing order by a judicial authority in that it required HOLLI and Marti to lay out all of their lawsuits pending in every state and federal court, the amounts involved in the suits, when resolution could be expected, and to identify if any judgments had ever been entered against HOLLI and MARTI. Without HOLLI's knowledge, GROSS had already ordered an investigation report on HOLLI without HOLLI's consent and which indicated that HOLLI's household when not a credit risk whatsoever to the USDA. The relevant part of that 70 page investigation report is attached hereto as exhibit "17" and redacted with respect to it's report numbers.

      30.    HOLLI responded via email by Sunday, December 9, 2018, asserting that neither her or Marti had any pending money judgments against them in any of their self initiated civil lawsuits, that Holli and Marti's litigation activities were not material to their present poor status and qualifying for the referenced section 502 direct loan, that the property was not at risk for being attached for any of HOLLI or MARTI's litigation activities because the title to the property was to be in the name of the Lundahl- Telford Trust, a special needs trust organized under the laws of the Social Security Administration for SSI

funded households, and these types of trusts could not be attached outside of a materialsmen doing direct work on the property or the county attaching the property for unpaid taxes. HOLLI argued that no attachment on property taxes was possible because the USDA was to escrow the property taxes and insurance into their mortgage payment which was to be automatically deducted from HOLLI and MARTI's monthly SSI payments.

31.    HOLLI emailed GROSS exhibit ""10" attached,  the pertinent parts of a 2017 fair housing complaint advanced by HUD against an apartment complex in New York because the Complex refused to sell an apartment  to a special needs trust in favor of a disabled person pursuant to an accommodation demand.  HOLLI also emailed GROSS the stipulated settlement entered in that action and adopted by the federal court  and which concluded that refusing to sell to a special needs trust would violate no less than three separate provisions of the FHA.  The relevant parts of that settlement are attached hereto as exhibit "11".  The disabled person was awarded $120,000 in monetary damages for the apartment's  failure to sell to a special needs trust.  Accordingly, GROSS' refusal to close the sale at the midnight hour  because HOLLI wanted title in the name of her special needs trust,   was another act of false pretext for  actual housing discrimination.

32.    GROSS also demanded that HOLLI produce irrelevant banking documents from third persons regarding real estate properties HOLLI owned in the past and for the most part which are involved in litigation presently before Judge Peirsol's court in re USDC-S.D. Case no. 17-cv-5069 LLP;  a racketeering action where HOLLI is seeking treble damages for theft of titles to prior owned real estate.  HOLLI refused too attempt to violate the right to financial privacy of third persons that have no involvement in this  purchase transaction whatsoever. . . but did produce the respective county recorders'  title abstract records showing that HOLLI does not own certain prior real estate . . .as a result of the thefts reported in re  USDC-S.D. Case no. 17-cv-5069 LLP.

33.    GROSS' letter, exhibit "9" attached, also requires HOLLI  to produce all of the demanded information **within 15 days of December 7, 2018   or the   funded transaction   will not be closed and  HOLLI and MARTI's application will be canceled**. HOLLI believes that  GROSS will then intentionally deplete the funding amounts to another borrower to put it beyond HOLLI and MARTI's reach.  (See exhibit "12" attached [filed under seal]  for disclosure  statement by escrow company showing the escrow funded down to the last extortion demand - less the Penfed remainder grant of $5,000.  See PenFed letter

committing to wire  the remainder grant funds of $5,000 upon production of a closing disclosure statement by LANCE within 90 days of the application date which has now expired, as exhibit "13" attached.).

34.    There are  no  statutory provisions under the section 502 direct loan program that allow GROSS to take such illegal actions;  hence the need for an injunction under the ECOA  to be immediately issued  requiring  GROSS to :  (1)  come into  compliance with the ECOA's  requirement of considering all of  HOLLI's household's public assistance income and as required in exhibit "4" attached i.e. the regulations identified in HB-1-3550 and 7 CFR 3550.54 et seq.,  (2)  comply with the repayment income statute at  7 CFR 3550.53 (g)(1) and fund  a loan in the amount requested by HOLLI of $138,500, and (3) close title in the property in the name of the Lundahl-Telford special needs trust as required under the FHA and as shown in exhibit "11' attached.  See 15 U.S. Code § 1691e(c) under the ECOA and  providing:

(c)  Action for equitable and declaratory relief

Upon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction **may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this subchapter.**

Also see **U.S. v. Colgate-Palmolive Co., 380 U.S. 374 (1965)(The purpose of injunctive relief is to enjoin illegal conduct alleged in the complaint and prevent future violations of the law);**    Rogers v. 66-36 YELLOWSTONE BLVD. CO-OP. OWNERS, 599 F. Supp. 79, 85-86 (E.D.N.Y. 1984) **("prohibitive  injunctive relief enjoining future FHA violations is appropriate")**; FTC v. Golden Empire Mortgage, CV09-03227 (C.D.CA, 2009) (the plaintiff may seek, and the district courts may grant, preliminary and permanent injunctions against practices that violate any of the laws);  Cf., Smith v. Lakeside Foods, Inc., 449 F. Supp. 171, 172 (N.D. Ill. 1978) (**violation of a regulation rendered creditor liable**); "Discrimination is established when an applicant is treated  less favorably than other applicants." 12 C.F.R. § 202.2(n) (1979);  Park View Heights Corp. v. City of Black Jack, 605 F.2d 1033, 1036 (8th Cir. 1979) (The FHA "gives the district court the power it needs to fashion affirmative equitable relief calculated to eliminate violations of its provisions).

Also in matters dealing with real property, the uniqueness of the real property permits injunction to enforce the sale.  See FONTENO v. WELLS FARGO BANK,  A135577, A136359 (Cal.App. 2014) (Damages are not typically an adequate remedy when the contract

involves unique real property.  See Wilkison v. Wiederkehr (2002) 101 Cal.App.4th 822, 830 [noting that "**the legal remedy of damages is generally inadequate in real property disputes**"]; Civ.Code, § 3387 [stating that "[i]t is presumed that the breach of an agreement to transfer real property cannot be adequately relieved by pecuniary compensation"].)  Hence, we vacate the trial court's preliminary injunction ruling and remand this matter to the trial court to  impose the requested  injunction as an additional remedy.))

35.    Because of  the  direct statutory violations,  HOLLI  seeks an  immediate prohibitive injunction relief under both the ECOA and the FHA to prevent further violations and to  put  a  stop  gap  on  the  harm  that  she,  her  household  and  the  seller  are  presently experiencing  because of the defendants' intentional and malicious discrimination.

Specifically,  HOLLI  requests as  one of her entitled forms of relief,  that this Court  issue  an  immediate  order  to  show  cause  why  this  court  should  not  GRANT  the permanent injunction filed concurrently herewith  AND direct DIRECTOR  GROSS to:

(a)    order the proper loan funding amount for this transaction  in the amount of  $138,500,

(b)    issue  instructions  to  the  escrow  agent  that  after  the  closing  is completed, the escrow agent shall  return the extorted  sums placed  into escrow back to certain  "gifting"  third  parties as designated by Plaintiff;

(c)    issue instructions to close the escrow by December 28, 2018 and be liable for a daily penalty of $1,000 per day since December 3, 2018 when HOLLI had sufficient funds placed  into  escrow by third persons to comply with the last discriminatory and extorted fund commitment issued by the Defendants of  $107.904 as shown in exhibit "8" attached. Daily penalties are  authorized under common law rule as shown in exhibit "15"  attached in re Halderman v. Pennhurst State School & Hospital, 673 F.2d 628 (3rd. Cir. 1982)

(d)    that the Defendants be required to pay Plaintiff an additional penalty in the amount of  $110, 000  if they fail to close the escrow by December 31, 2018 at the funding  amount requested in this complaint and in the preliminary injunction,  to wit:  $138,500.

(e)    these delay penalties shall be in additional to the tort damages Plaintiff has set forth in her complaint.

/ I.

(f)    The Director instruct and order that title be placed in the name of the Lundahl- Telford Trust,  a special needs trust.

## FIRST CAUSE OF ACTION
### (Violations of the Equal Credit Opportunity Act By All Defendants)

36.    Plaintiff incorporates all prior allegations as if fully set forth herein and alleges that no defendant in this action is immuned  from liability for  ECOA violations.  See  Moore v. USDA,  case no. 94-40945 (5th Cir. 1995) (The plain language of the ECOA unequivocally expresses Congress' intentions:  governmental entities are liable under the Act.    See 15 U.S.C. § 1691a(e), (f) (respectively defining "creditor" to mean "person," and "person" to mean "government or governmental subdivision or agency.)

37.    Jurisdiction for this violation is set forth under **15 U.S.C. § 1691e  permitting civil liability for violations thereof.**

38.    To  establish a prima facie case under  ECOA,  Plaintiff must show  that (1) she was a member of a protected class, (2) she applied for and was qualified for a loan with the Lender, (3) the loan was rejected despite her qualifications, and (4) the Lender continued to approve loans for applicants with similar qualifications. *See Noland v. Commerce Mortgage Co.* 122 F.3d 551, 553 (8th Cir. 1997).

39.    Furthermore,    Plaintiff  may establish a per se discrimination claim, without resort to the McDonnell Douglas burden-shifting analysis, by establishing by a preponderance of the evidence that a protected characteristic played a motivating factor in the challenged action.  Costa v. Desert Palace Inc., 299 F.3d 838, 853-54 (9th Cir.2002).  Finally, if the plaintiff shows violations of the regulations under the act,  a presumption will exist that the defendant discriminated against the Plaintiff but not against other applicants.  U.S. v. Colgate-Palmolive Co., 380 U.S. 374 (1965);   Rogers v. 66-36 YELLOWSTONE BLVD. CO-OP. OWNERS, 599 F. Supp. 79, 85-86 (E.D.N.Y. 1984) ; Smith v. Lakeside Foods, Inc., 449 F. Supp. 171, 172 (N.D. Ill. 1978)

40.    It is undisputed that Plaintiff was a protected person under the ECOA because most of her repayment income derived from public assistance grants or stipends.    See 15 U.S. Code § 1691(a)(2):

(a)    Activities constituting discrimination.   It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a

credit transaction—

>       (2)  because all or part of the applicant's income derives from any
>            public assistance program

Furthermore, 15 U.S.C. § 1691(a) (1976) defines the term "discriminate against an applicant" to mean "to treat an applicant less favorably than other applicants." 12 C.F.R. § 202.2(n) (1979).

41.    The foregoing allegations also show that Plaintiff applied for credit and that Plaintiff and her sister were qualified for a loan in the amount of $138,500 pursuant to title **7 CFR 3550.53 - Eligibility requirements,** and the ECOA's and Section 502's statutory mandates (refer back to exhibit "4" attached) that all of Plaintiff's public assistance grants and stipends has to be considered in the credit / loan amount.

42.    The foregoing allegations also show that despite qualifications for the loan/credit amount of $138,500, Plaintiff was denied this amount of credit when at the midnight hour, the defendants dropped Plaintiff's credit amount to $107,904 (see exhibit "8" attached) from the original approved amount of $126,500 (see exhibit "7" attached) -- by refusing to consider all of Plaintiff's public assistance income into the repayment income calculation which set the maximum amount of Plaintiff's subsidized loan.

43.    The defendants also retaliated against Plaintiff for exercising her rights under the ECOA. See Moore v. Wells Fargo Bank, No. 3:10-CV-94 (E.D.TN, 2011):

> 15 USC § 1691 (a)(3) involves a retaliation claim under the ECOA. Under this provision a plaintiff must show that he suffered an adverse credit action based on exercising rights under the ECOA. Lewis, 135 F.3d at 406. An "adverse action" as defined by the ECOA is:
>
>> a denial or revocation of credit, **a change in the terms of an existing credit arrangement,** or a refusal to grant credit in substantially the amount or on substantially the terms requested. 15 U.S.C. § 1691(d)(6).
>
> **If plaintiff shows that they she was retaliated against because she complained about the appraisal procedures, a claim could be stated.**

42.    As the above record shows, Plaintiff spent weeks obtaining the name of the USDA's chosen appraiser in order to secure performance by a given deadline so as not to lose a valuable grant. The appraiser promised to timely perform, but did not. The Appraiser's untimely performance in conjunction with LANCE's failure to lock the grant, resulted in the loss of that valuable grant. Plaintiff sued the Appraiser in a state smaller claims court for loss

of one of her four grants.  LANCE retaliated against plaintiff by rejecting Plaintiff's Heroes Welcome Home grant; by not tendering an closing disclosure statement and wiring instructions on the Penfed grant with in the 90 day period identified in that approval letter shown at exhibit "13" attached, and;   obstructed the HomeStart Plus grant by not closing the escrow altogether by the end of the year.  Lance also retaliated by dropping the approval amount on Plaintiff's approved loan amount more than $18,000 at the midnight hour.  See Beard v. Worldwide Mortgage Corp., 354 F. Supp. 2d 789 (W.D. Tenn. 2005) (lender's motion to dismiss RICO claim denied where it was alleged that documents relating to home refinancing **were misleading and incorrect**);   Club 93, Inc. v. First Sec. Bank, Nos. 97-35919 & 97-35920, 1999 WL 310640 (9th Cir. May 7, 1999) (punitive damages were justified since there were repeated misrepresentations over many months and **the lender  was aware it had put the plaintiff in a "huge financial predicament"**);   Delzer v. United Bank, 559 N.W.2d 531 (N.D. 1997) (punitive damages totaling $1,076,000 awarded against lender based upon a claim it breached its contract to lend money and a further claim of deceit); Temp-Way Corp. v. Cont'l Bank, 139 B.R. 299 (E.D. Pa.) (**claims against lender for business coercion** and intentional interference with contractual relations), aff'd, 981 F.2d 1248 (3d Cir. 1992).

       44.    Plaintiff  seeks all monetary, equitable and injunctive relief allowed by law for violations of the ECOA.

## SECOND  CAUSE OF ACTION
### (Violations of Section 504 of the Rehabilitation Act of 1973  Against The State of S.D.)

       45.    Plaintiff incorporates all prior allegations as if fully set forth herein and alleges that no defendant in this action is immuned  from liability for Section 504 violations pursuant to the following mandate:

       Section(s) 1003,  provides:

       "(1)    A State shall not be immune under the Eleventh Amendment . . . from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.
       "(2)    In a suit  against a State for a violation of a statute referred to in paragraph (1), remedies (**including remedies both at law and in equity**) are available for such a violation to the same extent as such remedies are available

for such a violation in the suit against any public or private entity other than a State."    42 U. S. C. Section(s) 2000d-7(a).

46.    Chiang  v. Veneman et al.,  385 F.3d 256 (3d Cir.2004) set forth  examples of concluded violations of the ECOA for a class suit against  the USDA and also identified possible violations under section 504 if the protected class was disabled citing Section 504 and its implementing regulations at 24 CFR Part 8 which preclude discriminating in terms or conditions of the provision of loans secured by residential real estate;   Summarizing these violations:

> Chiang also alleges that the USDA administrators in Vermont further instructed Virgin Islands officials to give applications only to those class members on the waiting list **who became a "problem,"** and then told local employees **"you know what to do with it."   This message was uniformly understood by local USDA officials to mean that the applications were not to be processed,   but rather that actions were to be taken to make it difficult or impossible for the inquiring parties to meet qualifications and deadlines**, the intention being that the applicants would become so frustrated that they would withdraw their loan applications, **or that delays would result in disqualification** or other justification for denial of the applications.  In Chiang's submission, this became known in the local USDA office as the **"Impossible Yes": an application would be given out, but the USDA would make it impossible for the putative applicant to have the application fairly processed.**
>
> We conclude that the  foregoing demonstrates  the USDA's  pretextual actions  to deny credit on the  basis of race, gender,  national origin or disability.
>
> The district Court concluded that the pattern and practice manifested itself in three ways: (1) some members were denied an application package and told to put their names on an unlawful waiting list; (2) RHS provided other members with applications, **but then made it impossible for them to obtain credit by deliberately delaying and frustrating the process so that the program would run out of funds,** the applicant would become ineligible or the applicant would give up; and (3) even plaintiffs who did obtain loans were denied services such as loan workouts and payment moratoria.  All members of the class were protected . . .the loan process was frustrated based on impediments suited to the particular protection.
>
> We will affirm the class certification pursuant to Rule 23(c)(4)(A).

47.    The elements of a section 504 claim,  29 U.S.C. § 706(7)(B),  are as follows:

Prewitt v. United States Postal Serv., 662 F.2d 292, 309-10 (5th Cir. 1981)

> (1) that he or she  is handicapped under the definition of the Act; (2) that  he or she was "otherwise qualified" for  participation in a program;  (3) that he or she was rejected by reason of his or her handicap; and (4) that the program he or

she was rejected from receives federal financial assistance.

48.    There  is no  dispute that Plaintiff is decreed physically handicapped.  There is no dispute that Plaintiff and her sister collectively qualified for participation  in the single family housing  section 502 direct loan program and the subsidy  provisions thereto.   There is no dispute that the south dakota  RD officials managing this program refused to accept disability grants  funded  to  Plaintiff  annually  as  part  of  Plaintiff's  repayment  ability  income  thereby rejecting  plaintiff from enjoying the full benefits of the direct loan program i.e. a loan in the amount of  $138, 500 based on reasons directly related to Plaintiff's disability status.    There is  no  dispute  that  Plaintiff's  housing  assistance  grants  in  the  amount  of  $31,000  were available to Plaintiff in part because of Plaintiff's or her sister's disability statuses. There is no dispute that two of these grants were not funded because of the orchestrated delay tactics  of the  defendants  which  caused  these  grants  to  be  rejected.   There  is  no  dispute  that  the remaining two grants have either expired or will expire if not funded by the end of the year. And   there   is   no dispute   that  the  USDA   section  502  direct  loan  program  is  federally financially assisted.

Based on the foregoing,  Plaintiff's allegations  establish  multiple violations of the section 504  and Plaintiffs are entitled to all compensatory and injunctive relief allowed by law.

### THIRD  CAUSE OF ACTION
### (Violations of the Equal Protection Clause of the 14th Amendment Against Defendants GROSS,  LOCKWOOD and STEINLEY)

49.    Plaintiff incorporates all prior allegations as if fully set forth herein and alleges that Defendants GROSS,  LOCKWOOD and STEINELY in their personal capacities violated Plaintiff's equal protection rights to obtaining a section 502   direct home loan under the mandated terms set forth under 7 CFR 3550 et seq.,  in exhibit "4" attached,  and under the ECOA  as applied to applicants receiving public assistance. .

50.    Plaintiff  seeks  relief under the class of one theory via  Village of Willowbrook v. Olech, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) attached hereto as exhibit "14".    See too  City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985) (the Equal Protection  Clause  prohibits  a city  from  applying housing rules  and  regulations differently.)

51.  It is undisputed that the Code of Federal Regulations set the guidelines for

16.

determining repayment ability, not the capricious and arbitrary conduct of the loan officers and their superiors. It is undisputed that exhibit "4" attached sets forth the types of income that must be counted in one's repayment ability. It is undisputed that the Defendants did not consider or apply all of the income to which Plaintiff was entitled so that they could deprive Plaintiff of the full amount of loan benefits. Those guidelines and rules were not equally applied to Plaintiff in deliberate disregard for Plaintiff's equal protection rights.

52.     Further, it is undisputed that once loan eligibility certificates are issued, that the recipient has 45 days to complete their closing or be subjected to the re-application process – according to paperwork published by the USDA. It is undisputed that the internal policy by the USDA to not order an appraisal at the outset of the application period is an unconstitutional policy which prejudices the applicant and purports gives the USDA an unconscionable out and serves as false pretext for lending discrimination.

53.     The named defendants violated Plaintiff's equal protection rights, deprived plaintiff of properties as a result thereof and did so indifferently and maliciously under color of law.     Plaintiff seeks all compensatory, general and punitive damages as allowed by law.

## FOURTH CAUSE OF ACTION
### (Ex Parte Young For Prospective Injunctive Relief against Defendant GROSS)

54.     Plaintiff incorporates all prior allegations as if fully set forth herein and further alleges that in **McCarthy ex rel Travis v. Albert Hawkins, 381 F.3d 407(5th Cir. 2004),** the federal circuit Held: (the state waives sovereign immunity from suit in federal court under Ex Parte Young where the state official denies access to welfare programs subsidized by federal funds.) Likewise here.

55.     It is undisputed that Defendant GROSS canceled the extorted loan commitment made in the amount of $107,904 by her letter dated December 7, 2018 and attached in redacted form hereto as exhibit "9". It is undisputed that as false pretext GROSS claimed that Plaintiff' and her sisters' joint application was incomplete . IN FACT, UNDER THE CODE OF FEDERAL REGULATIONS. PLAINTIFF AND HER SISTER HAVE FULLY COMPLIED WITH IT'S MANDATES UNDER  7 CFR 3550, ET SEQ. . . .AND THAT GROSS' LETTER IS SIMPLY ANOTHER EXTORTION AND DISCRIMINATORY ATTEMPT TO BLOCK PLAINTIFF'S ACCESS TO THE SECTION 502 LOAN PROGRAM as asserted in **Chiang v. Veneman et al., 385 F.3d 256 (3d Cir.2004),** supra.

56.   Plaintiff continues to suffer ongoing harm and damages every day  this  loan is not closed and she has no access to the home. Further, the Seller has given Plaintiff a deadline of December 31, 2018  to close this transaction or the Seller is going to sell to another buyer the Seller procured just before the USDA issued their funding commitment for $126,500.

57.   Both the ECOA and the FHA provide for "prohibitive injunction relief" to enjoin present and future violations of these acts.  Ex parte Young provides the same. See exhibit "15" attached for authority that permits daily sanctions against state official for essentially delay damages.  Plaintiff therefore requests that her petition for permanent injunction against ongoing violation of the laws,  be immediately granted

## FIFTH  CAUSE OF ACTION
### Violations  of The Federal Housing Act, 42 U.S.C. § 3601, et seq. for Failure to  Accommodate, Retaliation  And  Hostile Environment Violations

58.   Plaintiff incorporates all prior allegations as if fully set forth herein and  further alleges

### A.  Per Se Violation of the Reasonable Accommodation Provision Against GROSS, LOCKWOOD and STEINLEY

59.   A Persons commits a prima facie Accommodation Violation under the FHA when the  following  elements are met:

(1)   [plaintiff] suffers is  disabled  as defined in 42 U.S.C. § 3602(h); (2) defendants knew of [plaintiff's] disability status; (3) accommodations to the disabled person 'may be necessary' to afford [plaintiff] an  equal opportunity to use and enjoy the dwelling; and (4) defendant refused to make such accommodation.  USA . 505 Central Ave. Corp., case no. 17-cv-351 (S. D.N.Y. 2017).

60.   It is undisputed that both HOLLI and MARTI were disabled and that the defendants knew HOLLI and MARTI were disabled.  The following describes how the reasonable accommodation requests were violated in terms of elements 3 and 4.

### (1)  Defendants GROSS and LOCKWOOD Refused to Close The Sale In The Name of a Disability Needs Trust

61.   A  violation  to either sell to or close a real estate purchase transaction in the name of a disability Trust has already been shown to be an established violation of the FHA

18.

in exhibits  "10" and "11" attached  hereto,  the complaint and stipulated Settlement Agreement in re USA . 505 Central Ave. Corp., case no. 17-cv-351 (S. D.N.Y. 2017).   **In fact this case concludes that the failure to sell a home to a disability needs trust establishes not only a violation of the accommodation rule 42 u.s.c. §§ 3604(f)(3)(B);, but also in the rule of making a dwelling unavailable to a disabled person, 42 U.S.C. § 3604(f)(I),   and in the rule of discriminating in the terms, conditions, or privileges of sale  to  a  disabled  person  in  violation  of  42 U.S.C. § 3604(f)(2).**

### (2)    Defendant  STEINLEY  Refused to Accommodate A Timely Appraisal  Date  Knowing That  A  Grant Would Be  Made Unavailable  To  the Disabled Household

62.    Defendant  STEINLEY promised to perform his duties by a date certain and produce his appraisal report  so  that  Plaintiff could secure one her of grants accommodating the acquisition of the property in the name of the disability special needs  trust. STEINLEY refused to  accommodate plaintiffs thereby making    STEINLEY   per  se  liable for an accommodation violation under the FHA.

### B.    Retaliation under the FHA In Violation of  42 U.S.C. § 3617 (Against GROSS, LOCKWOOD and STEINLEY)

63.    As stated supra, HOLLI sued the appraiser for specific performance and other contract violations in a state action.  As soon Steinley was served,  HOLLI's  funding amount was dropped  more than  $18,000 as a punitive sanction for complaining.  HOLLI  served a form 95 FTCA   claim for a later suit against the USA for the Washington DC Housing superiors negligent supervision, tortious interference with grant contracts and infliction of emotional and mental distress by employees of the United States.

64.    As shown by GROSS' letter, HOLLI contacted the chain of command all the way up to Washington DC and   the end   result of these administrative contacts was the revocation letter issued by GROSS at exhibit "9" attached and a demand for a pretextual investigation [1] –  when  there was nothing to investigate and similar bad faith  conduct to that

---

1.    In fact without Plaintiff's consent,  the USDA officials ran a detailed investigation against HOLLI through lexis nexus resulting in a 70 page report which supported HOLLI's right to obtain her requested loan.  See exhibit "17" attached.

complained of  in  Chiang  v. Veneman et al.,  385 F.3d 256 (3d Cir.2004) .

65.    The elements of  a  prima  facie  retaliation  claim under the FHA are (1) the plaintiff engaged in protected activity, (2) the defendant was aware of this activity, (3) the defendant took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action.  **Neudecker v. Boisclair Corp., 351 F.3d 361, 364-365 (8th Cir. 2003**

66.    Complaining to housing superiors in Washington DC, submitting an FTCA for 95 petition and filing a state smaller claims case regarding the entire obstructed process, is engaging in protected petitioning activities.   GROSS' letter at exhibit "9' shows that the defendants were aware that HOLLI was engaging in protected activities.  There also exists numerous emails proving up HOLLI's engagement in protected activities.  The defendants took adverse action against HOLLI when they dropped the approved loan amount to $107,904,  when they refused to close the fully funded escrow at the midnight hour (albiet funded through last minute extorted funds)  and when they issued a false pre-text letter claiming there were issues with Plaintiff's application, when in fact there were none. The causal connection between all of the retaliatory acts alleged herein were directly related to Plaintiff's petitioning activities.

67.    HOLLI seeks all compensatory, general and punitive damages as allowed by law.

### C.    Hostile Housing Discrimination Against All In Violation OF  Title 24 CFR § 100.7(a)(1)  Against GROSS, LOCKWOOD and STIENLEY

68.    (4)   Title 24 CFR § 100.7(a)(1), third party liability, provides:
         (a)(1)  direct liability by any person under the following conditions:
                (i)  **The person's own conduct** that results in a discriminatory housing practice.
                (ii)  **Failing to take prompt action to correct and end a discriminatory housing practice by that person's employee**  or agent, where the person knew or should have known of   the discriminatory conduct.
                (iii)  **Failing to take prompt action to correct and end a discriminatory housing practice by a third-party,** where person knew or should have known of the discriminatory conduct and had the power to correct it.
         (2)   For purposes of determining liability under paragraphs (a)(1 )(ii) and (iii) of this section, prompt action to correct and end the

discriminatory housing practice may not include any action **that penalizes or harms the aggrieved person,** such as eviction of the aggrieved person.

(b)    Vicarious liability.   A person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of  whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law 81 Fed Reg. At 63,069.

60.    Defendants all the way up to the chief in the chain of command in Wahsnington DC knew about HOLLI's complaints.  Their RESOLVE was to strip HOLLI of all housing rights;  rights strictly prohibited under the  ACT.  Furthermore, there exists vicarious liability on the behalf of the state because GROSS as the director,  established a policy of profound discrimination without justification.    HOLLI seeks all compensatory, general and punitive damages as allowed by law.

WHEREFORE,  PLAINTIFF prays as follow:

1.    For compensatory, general, special and punitive damages against all private  party  and state officials  sued in their personal capacities on all causes of action except Plaintiff's Section 504 claim which is directly against the state housing office.

2.    For  prospective declaratory and injunctive relief against all defendants as provided under Plaintiffs' ECOA,  FHA, Section 504 and Ex Parte Young Claims;

3.    For Compensatory and general relief against the state  housing office in their official capacity  under  the ECOA  and Section 504;

4.    For pre and post judgment interest;

5.    For attorneys fees and costs as allowed by law;

6.    For trial by jury.

7.    For delay penalties in closing.

Dated:  December 13, 2018    _____

Holli Lundahl
P.O. Box 105, Hot Springs SD 57747

VERIFICATION

Pursuant to SDCL 18-3-5,  I Holli Lundahl affirm  that the foregoing is true and correct.

_____

Hplli Lundahl

21.